**James STUMPF, Trustee for the Chapter 7 Estate of Faith White, and other similarly situated persons, Plaintiff,**

v.

**MEDICAL BENEFITS ADMINISTRATORS, SAFECO, Inc. (sic), and Stetson Building Products, Inc., Defendants.**

**Safeco Life Insurance Company, Third–Party Plaintiff,**

v.

**Alliance Benefit Group Medical Services, L.L.C., Third–Party Defendant.**

**No. 8:99CV185.**

United States District Court, D. Nebraska.

Sept. 14, 2001.

Michael B. Kratville, Kratville Law Firm, Omaha, NE, for plaintiff.

William G. Garbina, Lieben, Whitted Law Firm, Omaha, NE, Roger T. Stetson, Belin, Lamson Law Firm, Des Moines, IA, for defendant.

John M. Lingelbach, Koley, Jessen Law Firm, Omaha, NE, for Safeco.

## MEMORANDUM AND ORDER

BATAILLON, District Judge.

This matter comes before the court on cross motions for summary judgment. Filing Nos. 64 and 68. This is an action under the Employee Retirement Income Security Act, 29 U.S.C. § 1101, *et seq.* (ERISA). Plaintiff Faith White [1] filed this action for damages under ERISA, alleging that Stetson Building Products, Inc. ("Stetson"), Medical Benefit Administrators ("MBA"), and SAFECO breached fiduciary duties to her by denying payment of her pregnancy-related medical expenses.[2]

---

1. White filed bankruptcy in January 1999. James Stumpf, trustee, now represents the bankruptcy estate and has been substituted as plaintiff. Plaintiff will nevertheless be referred to as "White" for ease of reference.

2. Plaintiff's claim against SAFECO was later dismissed on plaintiff's own motion. Default judgment was entered against MBA. Additionally, Stetson filed a cross-claim against SAFECO. Stetson alleges Safeco is liable to it under an Excess Loss Contract. Thus the

Stetson moves for summary judgment. It asserts that the undisputed evidence shows that it did not abuse its discretion in denying White's claim. White moves for partial summary judgment. She asserts that the undisputed evidence shows that Stetson breached its fiduciary duties under ERISA, but reserves the issue of damages.[3]

## I. Facts

The undisputed evidence shows that Faith White was an employee of Stetson Building Products, Inc. Stetson had an employee benefits plan under ERISA (the Plan). Stetson was the administrator of the Plan and had discretionary authority to administer it. Stetson contracted with Medical Benefits Administrators (MBA) to process claims under the Plan, and also contracted with SAFECO for excess loss coverage. Stetson's contract with SAFECO provided that SAFECO would pay covered claims after Stetson paid a $10,000.00 deductible per individual employee. The Plan is self-funded, that is, all claims were to be paid out of Stetson's general assets, subject to the excess loss contract with SAFECO.

White underwent an in vitro fertilization procedure (IVF) on March 13, 1998. The Plan excludes coverage for "services and supplies for or related to artificial insemination, in vitro fertilization, charges for donor ova or sperm, and other means of assisted reproduction." White did not seek any reimbursement for the costs of that procedure. Ten days after the procedure, on March 23, 1998, White was admitted to the emergency room at Rush Presbyterian Hospital in Chicago while on a business trip. She was diagnosed as having severe "ovarian hypersensitivity syndrome" (OHS) and was hospitalized from March 23, 1998, until April 1, 1998. During the hospitalization, she had a paracentesis[4] procedure in which nine liters of fluid were removed from her abdomen.

The hospital sought and obtained precertification for the admission from MBA. MBA referred the request to a company called Preferred Review for determination of whether the admission was medically necessary. The admission was certified as medically necessary and was monitored "day by day for [inpatient] necessity." Exhibit A attached to Affidavit of Richard Bartolo. A March 25, 1998, notation in the clinical notes maintained by Preferred Review indicates "per Jane this is felt to be related to the embryo transplant" and later notes "the etiology of ovarian hyperstimulation syndrome is related to the fertility drugs utilized with re: to embryo transplant—both of which are rx for infertility—of that question relates to benefit design." Exhibit A at 3. On March 30, 1998, the clinical notes state "refer to PJW for maternity case eval[uation]." Exhibit A at 4.

The discharge summary for the hospitalization lists White's final diagnosis as "1. Ovarian hyperstimulation syndrome" and "2. History of an in vitro fertilization." Defendant's Exhibit 5. The discharge summary also states: "[o]n admission the patient's beta HCG was 83" and "[b]eta HCG

---

only remaining claim against Safeco is Stetson's cross-claim.

**3.** SAFECO has also moved for summary judgment on Stetson's cross-claim, Filing No. 66, and Stetson has moved for an extension of time in which to respond to that motion, Filing No. 78. The court will grant Stetson's motion for an extension of time, and will reserve ruling on the motion.

**4.** Paracentesis is extraction of fluid from a cavity. Stedman's Medical Dictionary 1024 (5th Unabridged Lawyer's ed.1984).

upon discharge was 568."[5] Defendant's Exhibit 5.

Pursuant to the Plan, White submitted a claim for the expenses of the hospitalization to Stetson's third-party administrator, MBA, and the claims were denied. On August 17, 1998, MBA wrote to SAFECO (Stetson's excess loss carrier) seeking SAFECO's opinion, stating the issue as "whether the inpatient admission is directly related to the IVF procedure or if the charges were incurred for a related but eligible cause." Defendant's Exhibit 6. The inquiry noted, "[w]e are requesting this preliminary decision on whether the Chicago charges should be eligible" and further noted that "[t]his would put Ms. White into a reinsurance claim." Defendant's Exhibit 6. SAFECO responded, "[i]n our opinion ... the treatment rendered for during (sic) the inpatient admission ... was related to the in vitro fertilization—a direct result of the drug therapy used for the IVF" and that the expenses "would not be reimbursable in the event of an Excess Loss claim." Defendant's Exhibit 7. SAFECO offered to send the claim out for an outside physician review, and later did so. The outside physician responded that "[t]he 'ovarian hyperstimulation syndrome' described in the records is an unfortunate but well-known complication of ovarian hyperstimulation ... related to the in vitro fertilization," but also noted, "[t]his patient's pregnancy would be considered a direct result of the in vitro fertilization, which is done precisely for that purpose." Defendant's Exhibit 11.

White appealed the denial of coverage and, pursuant to the appeal process, sought a letter from her treating physician. Her treating physician, Dr. Victoria Maclin, wrote a letter to the MBA claims department on September 30, 1998, stating

that, "[w]hile it is indeed true that the patient was previously treated with fertility drugs, the fact that she did develop severe ovarian hyperstimulation syndrome was the result of the pregnancy that was established, and not simply because she had been previously treated with fertility drugs." Defendant's Exhibit 8. Dr. Maclin explained, "[i]t is only those patients who become pregnant who have development of this severe syndrome when it does occur." Id. The Plan covers "maternity related expenses for a Covered Person." Defendant's Exhibit 2 at 25.

John Willmore is Stetson's Chief Financial Officer and the Plan Administrator. He made the ultimate decision to deny benefits. He testified that, in making the decision, he relied on the opinions of MBA, SAFECO, and Stetson's attorney, Roger Stetson. Defendant's Exhibit 12, Deposition of John Willmore, at 10. He testified that he did not review any medical records from the Chicago hospitalization. Id. at 14. He further testified that he had no medical or science background, that he did not request any information or research on ovarian hyperstimulation syndrome, and that he did not contact or speak to any doctors, including White's treating physician. Id. at 3 & 14. Moreover, he testified that he had no knowledge of the documents or information on which either MBA or SAFECO relied in making their assessments. Id. at 46. Further, he testified that he did not know the educational background or professional experience of the physician who rendered the outside opinion. Id. at 54. He formed the opinion that White's claim was not covered after receiving Dr. Maclin's letter, but discounted Dr. Maclin's opinion because "they [MBA and SAFECO] stood by their origi-

---

**5.** HCG is human chorionic gonadotropin, a hormone "extracted from the urine of preg- nant women and produced by placental trophoblastic cells." Stedman's at 601.

nal decision that it wasn't a covered claim." *Id.* at 59.

Willmore further testified that he agreed that once a covered person became pregnant, charges related to pregnancy would be covered expenses under the Plan. *Id.* at 15 & 37. He testified, however, that he did not know whether or not White had ever become pregnant, *id.* at 22, and that "based on everything we were told, she was not pregnant" at any time. *Id.* at 37. In his affidavit, Willmore stated that he was aware that Faith White had received an in vitro fertilization procedure but "did not know whether the procedure was successful and whether White actually was pregnant at the time of her hospitalization or thereafter." Defendant's Supplemental Exhibit 2. He stated that he was aware White did not have a child in 1998, nor did she miss work for maternity leave, but that "[w]hether or not Faith White was pregnant at the time did not affect [his] decision." *Id.*

A radiology report from the Chicago hospitalization transcribed on March 23, 1998, notes, "single view done only as PT is pregnant." Plaintiff's Exhibit No 38. The evidence also shows that claims for treatment of conditions diagnosed as "high-risk pregnancy" and "normal pregnancy" were paid-for services rendered on April 4, 1998, and April 11–16, 1998. Plaintiff's Exhibit 15. Claims under a diagnosis of "ovarian hyperfunction" were paid to University Medical Associates and to Nebraska Health System for treatment from April 9, 1998, and April 27, 1998. Plaintiff's Exhibit 9. Plaintiff's medical records show that several additional paracentesis procedures were performed during this time. Plaintiff's Exhibit 41. All of these claims were paid. Plaintiff's Exhibit 9. A claim was also paid for surgery on May 25, 1998. Exhibit 13, copy of a document outlining medical claims charges, containing handwritten notation, "OK miscarriage." Further, clinical notes for a pre-certification review by Preferred Review show that White was admitted to Nebraska Methodist Hospital on May 25, 1998 with a diagnosis of "threatened miscarriage." Although it had been denied initially, a claim for the doctor's services in connection with the Chicago hospitalization was later paid. Plaintiff's Exhibit 9. Stetson characterizes that payment as a mistake. Defendant's Supplemental Exhibit 1, Affidavit of Richard De Bartolo.

The uncontroverted evidence shows that MBA had no medical personnel, either registered nurses or M.D.s, to make medical determinations, and "had no process for obtaining medical reviews for difficult claims situations." Plaintiff's Exhibit 36, Deposition of Mary Tillemans, at 21. MBA ordinarily referred claims to an outside consulting firm, Preferred Review; however, in this case, MBA sought a medical opinion from SAFECO. *Id.* at 23–29. SAFECO was asked for a medical determination so as not to "generate fees for MBA." *Id.* at 65.

The evidence also shows that several conflicting reasons were given for the denial: a preexisting condition; an uncovered reversal of a tubal ligation; and finally, as related to an in vitro fertilization. Plaintiff's Exhibits 21, 22, & 24. The "explanations of benefits" letters sent to White state only that the claims were rejected as "ineligible expenses," "this is not a covered diagnosis under your plan," and "refer to plan limitations/exclusions." Plaintiff's Exhibit 32.

## II. Discussion

### A. Applicable Law

On a motion for summary judgment, the question before the court is whether the record, when viewed in the light most fa-

vorable to the nonmoving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(C); *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1326 (8th Cir.1995). Where unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate. *Id.*

■ ERISA provides a plan beneficiary with the right to judicial review of a benefits determination. *See* 29 U.S.C. § 1132(a)(1)(B). The first issue in considering an ERISA claim is the appropriate standard of review, an issue that affects both the evidence admissible in district court and the legal standard to be applied. *Ravenscraft v. Hy–Vee Employee Benefit Plan & Trust*, 85 F.3d 398, 402 (8th Cir. 1996). Where a plan gives the administrator discretionary authority to determine eligibility for benefits, the court ordinarily reviews the administrator's decision for an abuse of discretion. *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir.1998); *see also Schatz v. Mutual of Omaha Ins. Co.*, 220 F.3d 944, 947 n. 4 (8th Cir.2000) (noting that review for abuse for discretion and review as arbitrary and capricious are interchangeable terms). The parties do not dispute that the Plan gives Stetson discretionary authority to determine benefit eligibility.

■ Under the deferential "abuse of discretion" or "arbitrary and capricious" standard, the Plan Administrator's decision to deny benefits will stand if reasonable, i.e., supported by substantial evidence. *Fletcher–Merrit v. NorAm Energy Corp.*, 250 F.3d 1174, 1179 (8th Cir.2001) (noting that the district court may not merely substitute its opinion for that of the plan administrator, but must determine whether a reasonable person could have reached the same decision). Substantial evidence is "more than a scintilla but less than a preponderance." *Donaho v. FMC Corp.*, 74 F.3d 894, 900 n. 10 (8th Cir.1996). In conducting judicial review under the deferential standard, the reviewing court looks to the evidence before the plan administrator when he or she denied the claim. *Ravenscraft*, 85 F.3d at 402.[6]

■ In determining whether an administrator's interpretation of a plan is reasonable under this standard, the court examines five factors: 1) whether the administrator's interpretation is consistent with the goals of the plan; 2) whether the interpretation renders any language in the plan meaningless or internally inconsistent; 3) whether the administrator's

---

**6.** In the present case, the "administrative record" includes the documents submitted to and relied on by MBA as Stetson's "third-party administrator" or "plan supervisor." The Plan specifies that "Stetson has retained the services of an independent third-party administrator, Medical Benefit Administrators, to process claims for this self-funded plan," but expressly notes that while "[t]he Named Administrator may delegate responsibilities for the operation and administration of the plan," Stetson retained "sole authority and responsibility to review and make final decisions on all claims." Defendant's Exhibit 2 at 1. "Plan Supervisor" is defined in the Plan as "the person or firm employed by the Company to provide consulting services to the company in connection with the operation of this Plan and any other functions, including the processing and payment of claims." *Id.* at 45. The fact that Stetson may have recourse against MBA for any alleged deficiencies in its processing of the claim does nothing to alter Stetson's position vis-a-vis White. *See, e.g., Harold Ives Trucking Co. v. Spradley & Coker, Inc.*, 178 F.3d 523, 525–26 (8th Cir.1999) (allowing civil action by a plan against third-party administrator for breach of fiduciary duty under ERISA). For purposes of claim processing and review, MBA functioned as Stetson's agent. Accordingly, the court will consider the evidence before MBA when it denied the claim.

interpretation conflicts with the substantive or procedural requirements of the ERISA statute; 4) whether the administrator has interpreted the relevant terms consistently; and 5) whether the interpretation is contrary to the clear language of the plan. *Finley v. Special Agents Mut. Ben. Ass'n,* 957 F.2d 617, 621 (8th Cir.1992).

■ In certain circumstances, however, a less deferential standard of review applies. The less deferential standard of review is triggered where the plaintiff presents material, probative evidence demonstrating: (1) that a palpable conflict of interest or a serious procedural irregularity existed; (2) which caused a serious breach of the plan administrator's fiduciary duty. *Woo,* 144 F.3d at 1160.

■ A palpable conflict includes a direct financial benefit, such as when the administrator is also the insurer; but not every funding conflict *per se* warrants heightened review.[7] *Id.* & n. 2. When the administrator is also the insurer, there is "something akin to a rebuttable presumption of a palpable conflict of interest." *Schatz,* 220 F.3d at 947–48. Indicia of bias as a result of such a structural conflict of interest can be ameliorated by evidence of circumstances, such as equally compelling long-term business concerns, that militate against improperly denying claims despite such dual role. *Id.* at 948. Procedural

irregularities include denial of a claim without seeking an independent review, failure to properly investigate, or similar failure to use proper judgment. *Woo,* 144 F.3d at 1160.

The second prong of the *Woo* test requires that the plaintiff demonstrate that the conflict or irregularity has a connection to the decision to deny benefits. *Id.* The evidence offered must give rise to serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim. *Barnhart v. UNUM Life Ins. Co.,* 179 F.3d 583, 589 (8th Cir.1999).

■ If there is evidence that warrants the application of the less deferential standard of review, the court applies a "sliding scale" approach to determine how much less deferential the review should be. *Schatz,* 220 F.3d at 947; *Woo,* 144 F.3d at 1161. Under that approach, the evidence supporting the plan administrator's decision must increase in proportion to the seriousness of the conflict or procedural irregularity. *Woo,* 144 F.3d at 1161. Accordingly, if the conflict or procedural irregularity is found egregious, the record must contain "substantial evidence bordering on a preponderance" to uphold the plan administrator's decision.[8] *Id.*

### B. Analysis

■ Essentially, Stetson argues for application of the deferential standard of re-

---

7. Certain conflicts of interest or improper motives, however, will provoke even less deferential *de novo* review. *See Schatz,* 220 F.3d at 947 n. 5 (noting that this type of conflict or improper motive, a direct personal financial incentive for denying claims, "is different in kind from the sort of background conflict created by the mere fact that the same company is both the plan administrator and the plan insurer"). That type of conflict or improper motive is not present in this case.

8. Under the less deferential standard of review, the district court is permitted, but not

encouraged, to consider evidence outside the administrative record. *Brown v. Seitz Foods, Inc. Disability Ben. Plan,* 140 F.3d 1198, 1200–01 (8th Cir.1998) (allowing limited discovery for the purpose of determining the appropriate standard of review does not violate the general prohibition on admitting evidence outside the administrative record). Accordingly, *matters outside the administrative record,* such as deposition testimony, have been considered by the court only in connection with its findings regarding the less deferential standard of review.

view and argues that plaintiff cannot show an abuse of discretion. Stetson points to the fact that it consulted outside experts in support of its position that its actions were reasonable. Plaintiff, on the other hand, argues for application of the less deferential standard and argues that evidence of both a conflict of interest and procedural irregularities justify application of that standard.

The court first finds that White has made a showing that warrants application of a less deferential standard of review, but also finds that, even under the deferential standard, the undisputed evidence shows that Stetson abused its discretion in denying White's claim. *See, e.g., Conley v. Pitney Bowes,* 176 F.3d 1044, 1048 (8th Cir.1999) (stating a court need not resolve standard of review issue if it would reach the same conclusion under either standard).

White presented material probative evidence that a palpable conflict of interest existed given Stetson's admitted role as both insurer and administrator. *Woo,* 144 F.3d at 1160. This dual role functioned as more than a "background conflict," due to Stetson's suspect reliance on SAFECO's opinion regarding the reinsurance claim. Stetson articulated no ameliorating circumstances to overcome this structural bias. *Schatz,* 220 F.3d at 948. Moreover, the uncontroverted evidence also shows that procedural irregularities (failure to provide written notice, changing reasons for denial, lack of knowledge of the credentials of any of the people or entities rendering opinions, inconsistent payment of claims for the same diagnosis, and most importantly, failure to know or investigate whether Ms. White was pregnant) tainted the process. *Barnhart,* 179 F.3d at 588. Stetson's reliance on SAFECO's opinion is particularly suspect in view of the fact that

such reliance was not a standard procedure.

The court further finds these conflicts and procedural irregularities were connected to the denial of White's claim. The evidence shows that payment of the claim by Stetson for White's Chicago hospitalization would have involved a reinsurance claim. Stetson knew that SAFECO would deny its claim for reimbursement and Stetson would then have been responsible for payment of the claim. It is clear to the court that Stetson's motive in denying the claim was merely to avoid any payment that might eventually be denied reimbursement by SAFECO, and was not based on any reasoned application of either medical facts or legal analysis. The court thus finds that Stetson's actions in this regard were egregious, especially in view of its continued denial of the fact of White's pregnancy in the face of substantial evidence to the contrary. Accordingly, the court requires substantial evidence, bordering on a preponderance, to support the Plan Administrator's decision. The court finds barely a scintilla of evidence to support the decision.

The court need not analyze the evidence under the less deferential standard, however, since, even under the deferential standard of review, the court finds Stetson's decision to deny benefits is a breach of fiduciary duty. The decision is not supported by substantial evidence. To determine the reasonableness of the denial of benefits under the abuse of discretion standard, the court considers five factors. *Finley,* 957 F.2d at 621. First, the court finds the Plan Administrator's interpretation and application of the IVF exclusion was not consistent with the goals of the Plan. *See id.* The Plan "is designed to cover a wide range of services ... to the extent they are medically necessary to treat illness or injury." Defendant's Ex-

hibit 2 at 20. "Covered expenses" include "maternity related expenses." *Id.* at 25. The evidence shows, and indeed Stetson admits, that pregnancy is one cause of ovarian hyperstimulation syndrome. The fact that IVF may be a concurrent cause of ovarian hyperstimulation syndrome is irrelevant, since complications of pregnancy are admittedly covered. Stetson "should not be allowed to use the exclusion to swallow coverage for an underlying condition merely because the expenses incurred are contemporaneous with or follow [an excluded condition]." *Lutheran Med. Ctr. v. Contractors, Laborers, Teamsters and Eng'rs Health and Welfare Plan,* 25 F.3d 616, 620 (8th Cir.1994). Such an interpretation is not consistent with the goals of the Plan.

The court next finds that the interpretation of the exclusion renders other language in the Plan internally inconsistent or meaningless. *See Finley,* 957 F.2d at 621. The Plan excludes "services and supplies for or related to ... in vitro fertilization," but covers "expenses related to maternity." Defendant's Exhibit 2 at 31, 25. The internal inconsistency is apparent in that in vitro fertilization is intended to result in pregnancy. Or, to put it another way, pregnancy is a "complication" of IVF. Under the Plan Administrator's interpretation of the two competing clauses, coverage for any pregnancy as a result of IVF would be excluded. Such a result is absurd. Notably, the Plan contains no explicit exclusion of such pregnancies. The maternity benefits clause would be rendered meaningless by application of the IVF exclusion.

The court further finds that the Plan Administrator's interpretation conflicts with substantive and procedural requirements of the Plan and does not comply with ERISA. *See id.* ERISA requires that the summary plan description be "suf-ficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a)(1). Because the IVF exclusion and the pregnancy coverage are inconsistent under the Plan Administrator's interpretation, participants who read the Plan language would not anticipate that pregnancy as a result of IVF would not be covered. A summary plan description must not mislead, misinform or fail to inform participants of the requirements of the plan. *Lutheran Med. Ctr.,* 25 F.3d at 621. Also, ERISA requires an ERISA fiduciary to provide the benefits claimant with a written decision "setting forth the specific reasons for such denial, written in a manner calculated to be understood by the [claimant]." 29 U.S.C. § 1133(1); *Collins v. Central States, S.E. & S.W. Areas Health and Welfare Fund,* 18 F.3d 556, 561 (8th Cir. 1994). A fiduciary is obligated to set forth the rationale underlying his decision so that the claimant may adequately prepare an appeal to the federal courts, and so that a federal court may properly review the fiduciary's decision. *Id.* The explanation of benefits forms provided to White are not sufficient to apprise her of the specific reason for denial. None of the written communications from Stetson address the pregnancy issue. Though White may have had actual notice of Stetson's reason for the denial, Stetson's lack of technical compliance with ERISA requirements is a factor to be considered.

The court further finds that the administrator has not interpreted relevant terms consistently. *See Finley,* 957 F.2d at 621. The evidence shows that several different reasons were given for denying the claim and that expenses for treatment of ovarian hyperstimulation syndrome were covered after the Chicago hospitalization. Stetson may characterize one of the later payments as a mistake; even so, whether

intentional or negligent, the differing treatment of claims involving the same procedure and diagnosis shows that the Plan Administrator did not interpret terms consistently. Stetson has proffered no reason for the differing treatment. An unreasonable inconsistency in paying health benefits is evidence of arbitrary and capricious action. *Lutheran Med. Ctr.*, 25 F.3d at 621–22.

Also, the court finds that the Plan Administrator's interpretation is contrary to the clear language of the Plan. *See Finley*, 957 F.2d at 622. Again, the Plan clearly covers maternity expenses. The Plan Administrator's refusal to cover the claim is inconsistent with the Plan's plain language.

This is not a case involving "the mere fact that [a] Company reached a decision contrary to the beneficiaries' medical evaluator, when the Company based its decision on substantial evidence in the record," which would not "give rise to serious doubts about whether the decision was arbitrary." *See e.g., Glenn v. Life Ins. Co.*, 240 F.3d 679, 681 (8th Cir.2001) (involving competing medical reports). This is not a "battle of the experts" on an arcane medical issue. There was no evidence, much less substantial evidence, that contradicted White's treating physician's opinion that ovarian hyperstimulation syndrome is caused, or worsened, by pregnancy. A treating physician's opinion is entitled to greater deference than the opinion of a reviewing physician. *See, e.g., Donaho*, 74 F.3d at 901. The outside medical consultant's opinion is essentially meaningless. It states only that both pregnancy and ovarian hyperstimulation syndrome are "related to" IVF. Nothing in the consulting physician's opinion intimates that IVF is the sole cause of ovarian hyperstimulation syndrome. The consultant's opinion is more a misguided legal opinion on coverage than a medical opinion.

The court thus finds this action involves an "extraordinarily imprudent or extremely unreasonable" denial of coverage. *See Lutheran Med. Ctr.*, 25 F.3d at 620–21. By the time Stetson made the final decision to deny coverage, there was more than ample evidence indicating that Faith White was or had been pregnant. Both Dr. Maclin's letter and the consulting physician's opinion refer to the pregnancy. The fact that the discharge summary did not contain the word "pregnant" is of no consequence in light of the events that subsequently unfolded and considering the two doctors' letters.[9] Stetson's continued reliance on absence of knowledge of the pregnancy in the face of these facts is specious.

Stetson, through its administrator, MBA, was in possession of numerous documents showing that White was pregnant, including the payment of claims for treatment of pregnancy, additional paracentesis procedures for ovarian hyperstimulation, and ultimately, a miscarriage. All of these events occurred prior to the final denial of the claim.

Stetson attempts to avoid responsibility for its actions by invoking its reliance on "outside medical experts." As noted, the

9. Even before it received Dr. Maclin's letter, Stetson was in possession of documents that suggested, to anyone familiar with medical records, that White was pregnant. The records from the Chicago hospitalization contain radiology notes with the explicit notation that "the PT [patient] is pregnant." The hospital discharge summary refers to HCG levels that are associated with pregnancy. Contrary to Stetson's contention, the discharge summary does not state that the ovarian hyperstimulation syndrome "relates to IVF"—it merely lists both "ovarian hyperstimulation syndrome" and "history of in vitro fertilization" as diagnoses. The information contained in the discharge summary simply does not amount to substantial evidence on which to base denial of White's claim.

outside consultant's opinion did not actually conflict with, or negate Dr. Maclin's opinion. Stetson's unreasonable and arbitrary denial of coverage was based more on its faulty assessment of the competing provisions of the Plan than on any medical opinion. Although the procurement of independent medical review may be "a key factor in deciding whether [the court] should apply a less deferential standard of review in cases where the insurer is also the ERISA plan administrator," *see Glenn,* 240 F.3d at 681–82 (J. Bye, dissenting), it does not follow that the converse is true: that in every instance in which a conflicted administrator seeks an outside opinion, however faulty its premise, the administrator is absolved of its responsibility to discharge its fiduciary duty. The evidence in this case shows that Stetson relied on supposed medical opinions that were actually legal opinions, that had no basis in fact, and that were made by nonmedical personnel. Stetson did so without any knowledge of the credentials of the people on whose opinion it relied; and without any knowledge of the evidence on which they based their opinions. Moreover, although referred to variously as "third party," "outside," and "independent" sources, there has been no showing that any sources on which Stetson relied were truly independent. The relationship between all of these entities is suspect. MBA was, in effect, Stetson's agent—a subcontractor with whom it had contracted to process its claims. Neither MBA nor Stetson can claim reliance on an opinion from SAFECO when SAFECO too had an incentive to deny the claim. Also, the evidence shows that MBA's incentive to refer the claim to SAFECO for an opinion instead of Preferred Review was to avoid generating fees.

### III.   Conclusion

In view of the foregoing, the court finds that, whatever deference is due the Plan Administrator, Stetson has breached its fiduciary duty. Accordingly,

IT IS THEREFORE ORDERED:

1.   Plaintiff's motion for partial summary judgment, Filing No. 64, is granted; a hearing on the issue of damages will be set by further order of the court;

2.   Defendant's motion for summary judgment, Filing No. 68, is denied;

3.   Stetson's motion for an extension of time in which to reply to SAFECO's motion for summary judgment, Filing No. 74, is granted; Stetson shall file its brief by October 1st, 2001, at which time the court will consider the matter submitted.